OPINION OF THE COURT
Herbert Kramer, J.
The plaintiff, Park Slope Jewish Center (PSJC), is the product of the consolidation of three separate congregations.
Bnai Jacob was incorporated in 1884 as an “orthodox religious corporation.” Bnai Sholaum was incorporated in 1896 to further the “interests of Judaism and for spiritual improvement.” Tifereth Israel was founded in 1912 “to meet and conduct prayers.” No express membership requirements were found in the founding papers of these congregations.
In 1941, Bnai Jacob and Tifereth Israel were consolidated by requisite court order. The bylaws state that the dictates of the Jewish Orthodox religion shall be the fundamental principles of the new congregation.[1]
In 1960, by court order, Congregation Bnai Jacob Tifereth Israel was consolidated with Congregation Bnai Sholaum to *910 form PSJC. The PSJC’s constitution and unsigned and undated bylaws have been admitted into evidence as a disputed document.[2] Article I, § 3 states that the congregation shall be affiliated with the Union of Orthodox Jewish Congregations of America. The merger agreement states that an organ will be relinquished from Bnai Sholaum to the PSJC. The organ was used “in its usual function in a synagogue.”[3] There is no express mention to a prescribed manner of service in any of PSJC’s founding documents other than the disputed bylaws.
From 1960 to 1983, females were permitted limited participation purportedly in conformity with Orthodox Jewish tenets. In May 1983, a majority of the congregation voted to grant females full participation in all religious activities. A minority faction, opposed to this undisputed variance from the previous order of service, began holding separate services in the Center. This engendered a religious dispute which culminated in vandalism and heralded this action. The 1983 bylaws (which were dated and signed) contain no statement affiliating PSJC with the Union of Orthodox Congregations of America.
In 1983, the PSJC instituted suit to enjoin the minority from using the building and interfering with PSJC activities. In May 1984, the parties entered into a court-ordered stipulation which recognized and reaffirmed the legitimacy of the May 1983 vote on female participation and the February 1983 bylaws. These bylaws and the court-ordered stipulation required that any Jew, 18 years of age or older, be admitted to membership. The 1983 bylaws are silent as to the order of service other than “the . promotion of the religious and social spirit of Judaism.”
The stipulation also allowed the defendants to utilize the lower area of the Center for separate Orthodox services. It provides for the ultimate building sale, demolition, etc. The defendant minority was to incorporate under the name Bnai Jacob and would pay PSJC a fee for the use of the lower area. In return, PSJC would credit Bnai Jacob for each member of Bnai Jacob belonging to PSJC as well. Several months later, Bnai Jacob forwarded multiple membership applications to the PSJC, which were rejected. The PSJC then amended its bylaws to require members to commit themselves to equality of women in *911 religious services and to always support this principle in the future. The defendants then moved to void the amended bylaws as to said membership requirements.
DISCUSSION
Prior to Watson v Jones (13 Wall [80 US] 679), a doctrinal implied trust was widely used in America and England to decide interchurch and intrachurch disputes. (Tribe, American Constitutional Law, at 872-873.) Courts examined religious doctrine to determine whether the departure from founding doctrine was sufficiently significant to constitute a breach of an implied trust. The courts awarded church property to the group remaining faithful to the implied intentions of the church’s founders.
This approach was abandoned by Federal courts in 1871 in Watson (supra). The court held that in the absence of express language creating a trust, the court would defer to decisions of governing church bodies in hierarchal church disputes or to majority rule in congregational disputes.
State courts, however, continued to use the departure from doctrine analysis until 1969, when in Presbyterian Church v Hull Church (393 US 440 [1969]), the United States Supreme Court ruled this approach was in violation of US Constitution 1st Amendment. Instead, the court indorsed the neutral principles of law approach. Thus, courts would decide claims to property owned by religious entities by looking at the relevant documents as in any property dispute.
The 1st Amendment is offended should the court’s resolution of the matter involve interpretation of religious doctrine. Documents that civil courts may examine to settle religious disputes include those that are secular, such as deeds, relevant statutes, articles of incorporation, church documents and secular provisions of trusts and wills (1977 Wis L Rev 904), but may utilize secular portions of documents which have religious purposes. (Avitzur v Avitzur, 58 NY2d 108 [1983].) Ordinary principles of trust and property law can be used to settle these disputes without entangling the State in church affairs (First Presbyt. Church v United Presbyt. Church, 62 NY2d 110 [1984], cert denied_US_, 105 S Ct 514; Avitzur v Avitzur, supra; Jones v Wolf, 443 US 595 [1979]).
In First Presbyt. Church (supra), the court adopted the neutral principles of law approach. The court held that it may decide a property dispute without offending the prohibition against church/State entanglement contained in US Constitution 1st Amendment.
*912 Thus, a difference between competing church factions over religious doctrine does not permit a court to award property on the basis of religious doctrine (Russian Church of Our Lady of Kazan v Dunkel, 33 NY2d 456 [1974]). Similarly, use of the departure from doctrine analysis is no longer authoritative in light of Hull (supra). (Bennison v Sharp, 121 Mich App 705, 329 NW2d 466 [1982].)
Thus, all prior New York State decisions in this area may have limited value as precedent and must be subjected to the neutral principles analysis (see, e.g., Saint Nicholas Ukranian Orthodox Church v St. Nicholas Ruthenian Greek Catholic Church, 157 NYS2d 586 [1956]; Conklin v State of New York, 284 App Div 193 [1954]).
Many commentators and courts have rejected the implied trust doctrine as impossible to administer without interpreting religious doctrine (Tribe, op. cit., at 877; 1969 Sup Ct Rev 347, 377; Presbytery of Riverside v Community Church of Palm Springs, 89 Cal App 3d 910, 152 Cal Rptr 854; Presbyterian Church v Mary Elizabeth Blue Hull Mem. Presbyt. Church, on remand to Georgia Sup Ct, 225 Ga 259, 167 SE2d 658 [1969]).
The court in First Presbyt. Church (supra), however, has sanctioned the use of the implied trust theory in New York State to the extent that it involves no interpretation of religious doctrine. The court indicated that if the original precepts of a church were known, uncontested and unambiguous, then those precepts could form the basis of doctrinal trust to which claimants to that church’s property must be faithful (First Presbyt. Church v United Presbyt. Church, supra, at p 125).
In the case at bar, the court-ordered stipulation and the 1983 bylaws can be enforced through the neutral principles of law analysis. The stipulation, so long as viable, is clearly secular in nature, as it does not discuss the merits of the parties’ religious dispute. The stipulation concedes the 1983 bylaws as the controlling authority.
The prior congregations’ tenets are no longer controlling as the prior congregations did not survive. The consolidation of incorporated religious societies has the effect of terminating the existence of the prior organizations (Congregation Bnai Jacob Tifereth Israel v Stolitzky, 3 Misc 2d 54, 58 [1956]; 66 Am Jur, Religious Societies, § 66).
The provision of the stipulation allowing credit towards Bnai Jacob’s rent for dues paid to PSJC by Bnai Jacob’s members is significant. Here it is evidenced that PSJC anticipated and *913 accepted the reality of Bnai Jacob members, devoted to Orthodox Jewish tenets, becoming members of PSJC as well. It is outside the sense of this contract for PSJC to impose membership criteria which would effectively exclude Bnai Jacob members. Therefore, PSJC may not impose membership requirements which interfere with the rights of Bnai Jacob members to become permanent members of PSJC.
It is noted that Religious Corporations Law § 5 provides for internal qualifications of membership, which determination is binding on civil courts (Rodyk v Ukranian Autocephalic Orthodox Church, 31 AD2d 659 [1968]). PSJC, however, may not impose membership requirements by virtue of Religious Corporations Law § 5 to the extent that they interfere with the freely accepted obligations. This court holds that PSJC is bound to honor this secular stipulation, since religious corporations are governed by the same rules of law and equity as other corporations (Crest Chimney Cleaning Co. v Ahi Ezer Congregation, 62 Misc 2d 1040 [1970]). PSJC cannot use its religious status as a shield against contractual obligations.
The court cannot find an express trust created here by virtue of the mergers of different sectual groups and the melding of their practices in the absence of the disputed document. The 1983 bylaws as confirmed by stipulation reveal no express prohibition against adopting an admitted change in service. Absent any express language to the contrary, a majority of a congregation may change a manner of service (1969 Sup Ct Rev 347, 377; Religious Corporations Law § 195 [regarding majority rule]).
Having determined that the stipulation and 1983 bylaws are proper to be examined under the neutral principles of law approach, this court holds that the requirements of the stipulation expressly bar the PSJC from amending its bylaws to require members to pledge adherence to the equality of women in religious services.
Defendant’s motion is granted to the extent that PSJC may not restrict its membership requirements.

. The foregoing is agreed to by the parties.

. A hearing may be, but is not yet necessary, to determine the validity of that document. No other bylaws have been submitted which are contemporaneous with the 1960 consolidation. If established, there may be an implied trust to the extent of minimum membership requirements of the union of Orthodox Congregations of America.

. A hearing may indicate that an organ is rare among Orthodox Congregations and may be indicative of reform or conservative affiliation and liturgy.